OPINION OF THE COURT
Eugene L. Nardelli, J.
Local social services districts, including the City of New York, are generally required to bear part of the cost of Home Relief (50% State, 50% local district) and Aid to Dependent Children (50% Federal, 25% State, 25% local district). New York City, as a port of entry and a magnet for the uprooted, attracts many who have not been residents of New York State; but it benefits from section 62 (3) of the Social Services Law, which provides for reimbursement by the State for the full cost of assistance to recipients who are "State charges”. A State charge is a needy person without State residence (Social Services Law §2 [19] [a]). A person who resides continuously in the State for one year is deemed to have State residence and such residence continues until such person has "removed from the state and remained therefrom for one year” (Social Services Law § 117 [1]).
The regulations of the State Department of Social Services (SDSS) (18 NYCRR 310.1 [g]) provide: "Detailed information regarding former residence, names and addresses of relatives, employers, landlords, etc. shall be obtained for each person applying for public assistance and care who appears to lack State residence * * *. Verification of State-charge status shall be initiated immediately by interview and/or correspondence. The burden of proof of State-charge status rests with the local social services districts. If efforts to obtain information from out-of-State agencies prove futile, collateral references such as former employers, landlords, schools attended by children, churches, relatives, etc. shall be contacted. Public assistance or care shall not be withheld when need is indicated, pending the establishment of State-charge status.”
The SDSS conducted an audit of nonresident "State-charge” claims made to the State by the city for the period January 1976 through June 1981. Its draft report thereon, given to the city on December 21, 1982, found that the city had not *621 complied with 18 NYCRR 310.1 (g) in an astounding 90% of the 1,176 claims reviewed. Extrapolating from the 1,176-claim sample in order to cover all State-charge claims, the State concluded that it had overpaid the city by $25,370,016. The city was then permitted to review 50 claims. After making additional efforts to substantiate the "State-charge” status of these claims, it requested the SDSS to reconsider 17 of those 50 claims. The SDSS then allowed 14 of the 17 as valid "State-charge” claims and adjusted the asserted $25,370,016 overpayment downward by 28% to $18,266,412.
The city has brought this CPLR article 78 proceeding to challenge the audit and, as incidental relief, for reimbursement of $18,266,412 it expended for Home Relief and Aid to Dependent Children and which it alleges was wrongfully withheld.
The State sought denial of the petition, first, on the grounds that (1) petitioners lacked standing to sue and (2) the State had not consented to be sued in the Supreme Court and an entry of a money judgment against the State would be improper. The State recognized, however, that these threshold arguments had been rejected in Matter of Gross v Perales (130 Misc 2d 132 [Sup Ct, Spec Term, NY County]), and asked that decision be reserved pending the appeal of that case. The Court of Appeals has now ruled in that case, and the State’s position has again been rejected (Matter of Gross v Perales, 72 NY2d 231).
The question before the court then is whether the State’s determination (1) was made in violation of lawful procedure, (2) was affected by an error of law, or (3) was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty imposed (CPLR 7803; see, Matter of Gross v Perales, 72 NY2d 231, 235, supra). The second and third of these questions will be considered first.
WAS THE STATE’S DETERMINATION AFFECTED BY AN ERROR OF LAW?
When a person first comes to apply for assistance he is interviewed by a receptionist who fills out a report and feeds the material into a computer to bring to light prior public assistance, an active or closed Social Security insurance case, medical insurance, or food-stamp issue in the State. At this initial contact the applicant receives a packet of instructions and a 13-page application form — a State form — which he is *622 expected to fill out before his interview. Within a few days the applicant is interviewed at length (up to four hours) and often more than once by an eligibility worker, who may or may not write to out-of-State sources, which in turn may or may not deign to respond. After reviewing the data, the eligibility worker makes a decision as to residence status. The city contends that applicants have no incentive to misrepresent themselves as nonresidents (there being a belief, though an unfounded one, that residence is an advantage to an applicant) and that, at any rate, the computer reports and extended interview make misrepresentation of residence extremely difficult. The State counters that 18 NYCRR 310.1 (g) nevertheless requires documentation of State-charge status from an out-of-State agency or collateral source and imposes the burden of proof upon the city. The city, it argues, is not entitled to decide for itself what is required. The State points out that the requirements of section 310.1 (g) have been properly promulgated in bulletin 6, trans. No. 76-MB-8, the bulk of which is a reprinting of sections 310.1 to 310.3. In a short preamble on "Official Policy” (Item III, at 2), however, bulletin 6 offers the following: "Initiation Date (Documentation Date) means the date on which the agency first began verification of State charge status by interview or correspondence with persons other than the applicant having or presumed to have facts with respect to past residence of the presumptive State charge. Details of any such action shall be recorded in the case record.” (Emphasis supplied.) Thus, in neither the regulation nor in bulletin 6 is the meaning patent. It is not immediately clear whether "with persons other than the applicant” modifies "interview” as well as "correspondence”. Nevertheless, the question can be decided. The command of the regulation is that verification of State-charge status "shall be initiated immediately by interview and/or correspondence.” (18 NYCRR 310.1 [g].) If an applicant appears with rent receipts from another State for the three years just past, with school records of children from another State for such period, with immunization records from another State for such period, and employee’s statements of salary and deductions from another State for such period, surely then verification of State-charge status has been initiated (and effected) .by interview of the applicant and there is no need for interview of or correspondence with out-of-State sources. Thus the contact with out-of-State sources described later in 18 NYCRR 310.1 (g) is clearly an alternative method *623 of verification when the interview itself does not provide verification.
This conclusion does not imply agreement with the city’s contention that, if section 310.1 (g) does require confirmation from collateral sources, it is inconsistent with section 62 (3) of the Social Services Law. One challenging a regulation must show that it is so unreasonable as to be arbitrary (Ostrer v Schenk, 41 NY2d 782, 786). There is nothing unreasonable in permitting the entity which pays the bill to insist on the right to check the propriety of the charges against it.
It is unreasonable, however, to insist that the city’s verification by interview or correspondence (see, bulletin 6, op. cit.) must be with persons other than the applicant and that verification cannot be produced by the applicant at his interview. This insistence might not itself be fatal to the State’s position, but the State goes on to contend that the proper purpose of the audit was not to determine whether individuals were in fact State charges but simply to determine whether the city had complied with the record-keeping requirements of section 310.1 (g), a record keeping which it sees founded on correspondence with out-of-State sources. This is a surprising contention to encounter in a CPLR article 78 proceeding, which must be largely controlled by equitable principles (see, Matter of Geller v Veteran, 49 AD2d 574 [2d Dept]); it is most damaging where, as here, the State has misconstrued the requirement of section 310.1 (g). It tends to support the city’s charges that the audit was prompted by the State’s fiscal needs rather than the city’s defective documentation and that the State is seeking to defeat the purpose of section 62 (3) of the Social Services Law.
Moreover, the State has applied the wrong criteria for the determination of residence and nonresidence. The statutory definitions are clear: "Any person who shall reside in the state continuously for one year under the conditions hereinafter specified shall be deemed to have state residence. State residence so acquired shall continue until such person shall have removed from the state and remained therefrom for one year” (Social Services Law § 117 [1]). The State indeed has asserted that "[t]he SSL distinguishes between needy individuals who have resided continuously in the State and needy individuals who have not.” Yet the Metropolitan Regional Audit office right from the start took the position that the city had to document "that there was one continuous year of residency outside of New York State.” (Letter of Cornelius F. Philbin, *624 Project Director, Metropolitan Regional Audit office, Mar. 29, 1982 [emphasis supplied].) That letter goes on to "recommend that NYCIM comply with State Regulation Section 310.1 which defines non-resident State charge status as twelve continuous months of residency outside the State”. The final audit report of June 21, 1983 repeats this erroneous requirement for State-charge status: "individuals with one continuous year of residency outside of New York State before their date of entry to the State. The local social services district must document the one continuous year of non-residency.” The regulation does not, of course, so define a nonresident; it could not, in light of Social Services Law § 117 (1). A person born to nonresident parents outside the State and who resides here for three months of every year, for example, would never satisfy the definition of resident under Social Services Law § 117 (1). But it could never be shown that he had "removed [himself] from the state and remained therefrom for one year” (Social Services Law § 117 [1]). Never having acquired residence, there would be no need for him to do so. Part of the difficulty of Social Services Law § 117 (1) is that it uses the verb "reside” in the definition of resident but in a context in which "reside” does not mean to be a resident. Only loss of State residence by a person who already has it requires 12 months outside the State. (Social Services Law § 117 [1]; 18 NYCRR 310.1 [b].) Mr. Philbin’s letter stated that the preliminary results of the audit showed that 45.5% of the cases lacked any documentation, 46.5% had documentation but not of "one continuous year of residency outside of New York State,” and 8% had documentation that indicated "less than one continuous year of residency outside New York State.” The draft audit report, December 21, 1982, and the final audit report issued June 21, 1983 found that of 1,176 sampled State-charge items 1,056 were inadequately documented; that 42.7% of the cases failing to meet State standards had no documentation; that 49.9% had documentation but not for one continuous year outside the State; and that 7.4% had documentation that indicated less than one continuous year outside the State. The draft audit report projected a liability to the State of $25,370,016 and stated that the city "should comply with Department Regulation 310.1 and document one continuous year of residency outside of New York State for Non Resident State charge claims.” That requirement was repeated in the final audit report. A gloss is added in the Durkin affidavit, paragraph 20, A and B, that what must be proved is 12 *625 consecutive months outside the State immediately prior to application for public assistance. In all of this there is the unrealistic and unwarranted assumption that every new entry into the State must be regarded prima facie as a returning resident.
This erroneous requirement, moreover, was never published. If it had been properly published, its error might have been pointed out before an audit was conducted relying upon it.
WAS THE STATE’S DETERMINATION ARBITRARY AND CAPRICIOUS OR AN ABUSE OF DISCRETION, INCLUDING ABUSE OF DISCRETION AS TO THE MEASURE OR MODE OF PENALTY?
18 NYCRR 310.1 (g) provides: "The burden of proof of State-charge status rests with the local social services districts.” That requirement is a reasonable one to be set by an entity which is going to pay out moneys on such proof. Section 310.1 (g), however, does not set forth the standard of such proof. It is patent, however, that, if the purpose of Social Services Law § 62 (3) is not to be thwarted, an absolute standard, the elimination of even the possibility of someone having been in the State cannot be applied. State-charge status was denied in the case of Ms. Doe, who arrived in the city from Puerto Rico in November 1980, because (applying the wrong definition of residence) "the City had to demonstrate that she resided outside the State between November 1979 and November 1980,” and "[i]t is entirely possible that she lived in the State, but outside of New York City, between November 1979 and November 1980.” A standard of proof that must eliminate the possibility of someone having been in the State at a specified time, in the light especially of the huge number of claims, can only be an arbitrary standard. Ms. Doe had claimed that she had resided for the immediately preceding six years at a specified address in Puerto Rico; birth certificates were shown of two children born in Brooklyn in 1965 and 1967 and one born in Puerto Rico in 1975; there were copies in the file of four airline tickets in the fall of 1980 for the four members of the family and there were letters from schools in New York City stating that children were new students here; and a computer search showed no public assistance in New York City in the previous year. Perhaps not enough was shown, but no reasonable standard of proof was applied in the audit to reach that conclusion. The same "eliminate the possibility” standard is evident in the case of Peggy Hoe, who claimed to have first come to New York in April 1980. Ms. Hoe produced a rent receipt from October 1979 in North Carolina, an *626 immunization record showing innoculations of her daughter in North Carolina in 1979, birth certificates for herself and her daughter in North Carolina, a showing of a start of a tenancy in a New York apartment in April 1980 and of a start of a job in New York in May 1980. The conclusion that an absolute standard of proof was also applied in denying State-charge status to Ms. Hoe is inescapable.
To base so substantial a penalty on such an absolute and arbitrary standard of proof clearly defeats the purpose of section 62 (3) of the Social Services Law.
The audit was thus defective on three substantial grounds. First, the statute, Social Services Law § 117 (1), was misread so that an erroneous requirement for nonresident status, that there must be one continuous year of residency outside the State immediately preceding the time of entry, was applied. Second, 18 NYCRR 310.1 (g) was misconstrued so as to discount the input at the interview of the applicant and require "interview and/or correspondence” with out-of-State sources no matter what evidence should be produced at the interview. And third, an absolute and arbitrary standard of proof was imposed upon the city entirely inappropriate to the circumstances and resulting in the denial of the city’s right to reimbursement under Social Services Law § 62 (3), effectively frustrating the statutory purpose. In the light of those substantive errors, it is unnecessary to decide whether the State’s determination was made in violation of lawful procedure.
In view of these findings against the State, the court must state again that it finds no defect in 18 NYCRR 310.1 (g) beyond the awkwardness of language which led the State Department of Social Services to conclude that verification of State-charge status could not be effected at the interview of an applicant but had to be initiated by interview of and/or correspondence with out-of-State sources.
The petition is granted. The audit and the consequent decision by the State to recoup its payments to the city are void and without legal effect. The city is entitled to be reimbursed for the $18,266,412 expended and in dispute.